## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | |
|---|---|
| **PAUL ERICKSON, THOMAS CLIFT, and CRAIG NEUMAN**, | |
| Plaintiffs**,** | Case No. 3:24-cv-363 |
| v. | JURY TRIAL DEMANDED |
| **EXXON MOBIL CORPORATION**, | |
| Defendant. | |

## COMPLAINT

This action involves claims for religious discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 *et seq.* Plaintiffs Paul Erickson, Thomas Clift, and Craig Neuman ("Erickson," "Clift," and "Neuman," respectively and collectively "Plaintiffs") by and through their attorneys, allege as follows:

## INTRODUCTION

1.     This case is about the actions an employer took against three of its long-time employees because they sought an accommodation to the company's COVID-19 vaccine mandate. The employees—exempt from taking the vaccine under both federal and state law because of their religious beliefs—worked for more than six months without being vaccinated and without the company taking formal adverse action against them (though during this time, the company did threaten negative consequences for requesting an accommodation). Then, in August of 2022—when

1

virtually every other company that had tried a mandate had already rescinded it—the company decided to demote and financially penalize the high-performing employees for having the temerity to refuse the vaccine and for not acquiescing in the face of the company's repeated threats. The employer had put up with the resistance long enough; it was time to bring to heel the dissenters who quietly refused to fall in line.

2.      In late 2021, Exxon Mobil Corporation ("Exxon," the "Company," or "Defendant") determined that its employees must be vaccinated against the COVID-19 virus (the "Mandate"). The Mandate was set to go into effect in February of 2022—long after the pandemic had subsided and new variants of the virus had outstripped existing vaccines.

3.      While Exxon provided exemption request documents for employees unable to take one of the COVID-19 vaccines, the Company did not allow employees to have reasonable accommodations—as required under Title VII—from its Mandate.

4.      Instead, Exxon decided that while it would officially allow unvaccinated employees like Plaintiffs to continue working for the Company, it would nevertheless pressure and harass them to violate their religious beliefs and get the COVID vaccine. To this end, the Company issued each Plaintiff a vaccine exemption approval letter. Each letter affirmed Plaintiffs' "sincerely held religious belief" in conflict with the Company's Mandate, notified each Plaintiff that "your COVID-19 vaccination

exemption request was approved," and further affirmed that accommodating Plaintiffs "[did] not present an undue hardship to the business."[1]

5.    The letters to each Plaintiff were identical in all material respects, and the Company never rescinded, reversed, retracted, or otherwise questioned its acknowledgment that Plaintiffs had sincerely held religious beliefs in conflict with the Mandate that could be accommodated without unduly burdening the Company.

6.    But while the Company claimed each Plaintiff was "provided accommodation" to the Mandate, Exxon's "accommodation" was false, punitive, and retaliatory.    Instead of reasonably accommodating Plaintiffs, Exxon told each Plaintiff that, "in order to facilitate your exemption request, your existing job role was redesigned to eliminate the need for the COVID-19 vaccination."[2]

7.    Exxon's "redesigns" involved limiting Plaintiffs' "flight assignments . . . to domestic routes" only and reducing Plaintiffs' "supplemental duties" due to Plaintiffs' "base role now limited to domestic routes."[3]  These changes took effect in August and September of 2022—after the CDC had recognized that vaccinated and unvaccinated individuals should not be treated differently for purposes of transmission risk.[4]

---

[1] *See*, *e.g.*, Exhibit 1, Exxon Letter to Captain "Erikson" [sic] (July 27, 2022). Plaintiffs believe they were the only Exxon pilots to request a religious exemption to the Company's Mandate.

[2] *Id.*

[3] *Id.*

[4] *See* CDC Newsroom, *CDC streamlines COVID-19 guidance to help the public better protect themselves and understand their risk* (Aug. 11, 2022), available at https://www.cdc.gov/media/releases/2022/p0811-covid-guidance.html.

8.    Plaintiffs' demotions were in effect for barely two months when the Company lifted the entire Mandate.

9.    But despite the very brief duration of these changes, the Company used the limitations as a pretext for retaliating against Plaintiffs because they dared to refuse Exxon's Mandate.    Based on these Company's fabricated and excessive limitations, Exxon demoted Plaintiffs; artificially reduced their annual performance ratings; and denied their annual performance raises, cost of living adjustments, and incentive stock grants.

10.    The Company's discriminatory actions against Plaintiffs is especially evident for at least the following reasons: First, the Company used Plaintiffs' "redesigned" and domestic-only flight assignments as a basis for demoting them and giving them low performance ratings.    Yet Exxon regularly allowed other pilots (such as those on disability) to fly limited routes or to fly not at all for months at a time with no adverse consequences such as demotions or reductions in performance rankings.    Moreover, at any given time, numerous Exxon pilots (sometimes as many as half) were regularly unable to conduct certain international flights due to their FAA medical certifications having lapsed.    Yet the Company never retaliated against those pilots by, for example, reducing their performance rankings for the period in which the pilots were limited from certain international destinations.

11.    Second, though the "redesigned" flight assignments did not take effect until the summer and fall of 2022, the Company downgraded Plaintiffs annual performance ratings for the *previous* reporting period, which ended in April of 2022.

This retroactive application was a calculated move to penalize Plaintiffs for asserting their rights by submitting religious accommodation requests during the prior reporting period. Exxon's retaliation was plain: if you do not acquiesce to the Mandate, you will be punished.

12. Third, the absolute limitation to domestic routes only—which the Company cited as a key reason for the adverse actions it took against Plaintiffs—was unilaterally imposed and wholly unnecessary. The Company's "approval" letters to Plaintiffs stated that "several" countries imposed entry requirements during this COVID pandemic, including proof of vaccination, negative COVID-19 test results, or quarantine upon arrival. But in reality, very few countries ever had a vaccine requirement. The number of countries to which unvaccinated pilots were strictly barred was tiny if not nonexistent. And the most stringent requirements often applied to passengers rather than flight crews, as flight crew members were frequently exempted or subjected to different protocols to ensure continuity of international operations.

13. Moreover, many countries provided exemptions or alternative protocols for flight crew, such as regular testing, shorter quarantine periods, or no quarantine requirements, recognizing their critical role in maintaining supply chains and transportation. And of course, unvaccinated pilots (like Plaintiffs) could sometimes be scheduled for routes to countries with less stringent entry requirements or operate as part of crew rotations where their duties did not involve overnight stays or disembarking in countries with stricter mandates. In fact, in June of 2022 (months

after Plaintiffs had submitted their accommodation requests but before the Company barred them from flying internationally as part of its false "accommodation"), Captain Clift piloted an international flight to the Bahamas[5]  Captain Clift was perfectly qualified to complete this international trip in June of 2022 because, as Exxon admitted, the Bahamas had already lifted its vaccine entry requirement.[6]

14.     Even worse, even before the "domestic only" limitation imposed by the Company, Plaintiffs rarely flew internationally at all—especially at the time their restrictions were applied.  And if they did fly internationally, as Tom Clift did just prior to his demotion, it was to countries that had no issues with unvaccinated pilots—especially since it was the latter half of 2022 and countries around the world had already abandoned the notion that COVID-19 vaccines were effective against the Omicron variant that began spreading in late 2021.  The domestic-only restrictions were purely punitive measures taken against Plaintiffs' for requesting an accommodation from the Mandate—they were clearly not part of any *reasonable* accommodation.

15.     Fourth, the period during which Plaintiffs' "redesigned" duties and the Company's Mandate were simultaneously in effect was exceedingly brief, lasting barely two months.  The Plaintiffs had been fulfilling their job duties throughout 2021 and 2022 with no issues, including any flying required during the roughly seven

---

[5] *See* Exhibit 2 at 5, Exxon Position Statement to EEOC Regarding Charge of T. Clift (June 20, 2023).
[6] *Id.*

months when Exxon's Mandate was in place but before Plaintiffs were given their demotions and restrictions.

16.     Notably, the Company itself acknowledged in its letter "granting" Plaintiffs' exemption requests that these limitations would not unduly burden the Company's operations.   If that were the case, there was no basis to downgrade Plaintiffs' performance rankings even under Exxon's own terms.   The demotions and restrictions were all part of a coordinated scheme to punish Plaintiffs for the exercise of their religious rights.

17.     In short, the Company was looking for a reason to target Plaintiffs. Exxon's discriminatory "redesigns" were a thinly veiled pretext to marginalize Plaintiffs within the organization, effectively punishing them for exercising their rights in response to circumstances created by the Company itself.   By confining Plaintiffs to domestic routes and curtailing their supplemental duties, Exxon fabricated a basis to demote them, undervalue their contributions, and deprive them of fair compensation and advancement opportunities.   This systemic manipulation not only inflicted significant professional and financial harm on Plaintiffs but also underscores Exxon's intent to sideline them in retaliation for asserting their rights— a blatant violation of anti-discrimination laws.

18.     What is more, the Company forced this retaliatory "accommodation" and its consequences on Plaintiffs well after the Omicron variant had dispelled most people of the illusion that COVID-19 vaccines were capable of preventing infection and transmission (and should be mandated at all), and months after other companies

across the country had *retracted* their vaccine mandates.  The consequences of this retaliation continue to the present.

19.    The Company also used informal means to retaliate against Plaintiffs for requesting an exemption to the Mandate based on their sincerely held religious beliefs.  Captain Erickson, for example, was harassed multiple times by company managers, who told him—even after he had submitted his religious exemption to the Mandate—that refusing to comply with the Company's Mandate was "career suicide," like "slitting [his] wrists," and that he needed to "get the vaccination to avoid ruining [his] career."  He was later asked by his superiors to "please think very seriously this weekend about the career implications of not being vaccinated—very, very, seriously, please."

20.    Setting aside the fact that the overwhelming majority of U.S.-based companies navigated the COVID-19 pandemic without instituting a vaccination mandate, there were a multitude of no-cost accommodation options available in Plaintiffs' specific cases.

21.    Indeed, Exxon evinced religious discrimination by refusing to recognize that each Plaintiff had already been immunized naturally through contracting and recovering from the COVID virus.  As one district court has noted, "when . . . millions of people have already been infected, developing some form of natural immunity, and when people who have been fully vaccinated still become infected, mandatory vaccines as the only method of prevention make no sense."  *Louisiana v. Becerra*, No. 3:21-cv-03970-TAD-KDM, slip op. at 27 (W.D. La. Nov. 30, 2021).

22.    As the CDC recognized around the same time Exxon instituted its mandate, individuals with natural immunity have a greater resistance to the virus than individuals who have been vaccinated alone.[7]  Plaintiffs had each contracted and recovered from the COVID-19 virus.  Prior infection was thus superior to a vaccination primary series and there was no need to "redesign" their job roles, much less to retaliate against them for refusing a medical treatment that violated their faiths.

23.    Exxon further showed religious discrimination by downgrading Plaintiffs' performance rankings based on a limitation that, at any given time, was shared by sometimes as much as half the pilots in Exxon's Aviation Services group— namely, the inability to pilot flights to certain international destinations.  When a pilot's FAA medical certification lapsed from class one to class two, Exxon understood that pilot was not eligible to fly to certain international countries.  The Company would simply schedule around this limitation for this pilot.  It could have done the same for Plaintiffs here (assuming they were absolutely barred from *any* country when they received their demotions, a dubious proposition).

24.    Instead, Exxon chose to ignore the available options and act adversely against Plaintiffs despite the evidence and common understanding by the Spring of 2022 that vaccine mandates were ineffective in addition to being draconian.

---

[7] *See* CDC, *COVID-19 Cases and Hospitalizations by COVID-19 Diagnosis— California and New York, May–November 2021* ("CDC Report"), https://www.cdc.gov/mmwr/volumes/71/wr/mm7104e1.htm?s_cid=mm7104e1_w (noting that "[b]y October [of 2021], persons who survived a previous infection had lower case rates than persons who were vaccinated alone").

25.     To be sure, finding reasonable accommodations for vaccine mandates was not unique to Exxon.  But Exxon's actions were in stark contrast to the vast majority of employers that instituted vaccine mandates.  Indeed, most hospitals and even vaccine manufacturers managed to seamlessly follow federal law when implementing their new policies, providing reasonable accommodations to employees entitled to exemptions without harassing or retaliatory consequences.   Those companies recognized early, even by the Spring of 2022, that the available vaccines were ineffective at eliminating transmission of COVID-19.  Recognizing the value of maintaining their existing workforces, in conjunction with the scientific realities of already demonstrated vaccine inefficacy, these companies either chose not to enforce their respective mandates, or otherwise meaningfully accommodated their exempt employees.

26.     For instance, vaccine manufacturer Johnson & Johnson ("J&J") allowed its exempt salespersons to wear a mask when visiting doctor's offices, etc. as a reasonable accommodation from its vaccine mandate.  As one example of many, Donn Arizumi—a J&J sales representative from Hawaii—was provided a reasonable accommodation for his religious beliefs.  In fact, though Mr. Arizumi is unvaccinated, he would visit primary care doctors, oncologists, and cardiologists on a daily basis while working for Janssen, one of the companies that makes COVID-19 vaccines. When Mr. Arizumi asked for an accommodation to J&J's vaccine mandate, rather than make him uncomfortable about his beliefs, the Company merely asked for a letter explaining his position.   He was then granted the straightforward

accommodation of not taking the vaccine and just continuing to wear a mask when visiting client offices. There was no hassle; no phone calls from management to coerce him into taking the shot; no search for pretexts the Company could use to demote him and dock his incentive benefits; no holding his livelihood or professional development over his head. Merely a leader in the health care industry following federal law and providing a reasonable accommodation to its exempt employee.[8]

27.    Even companies that assumed (incorrectly) the vaccines were preventing transmission were willing to recognize that regular testing would mitigate any concern over employees remaining unvaccinated. After all, employees without an active COVID-19 infection certainly *could not* transmit COVID-19, regardless of their vaccination status. Exxon instead chose to place itself amongst the small minority of companies that refused to meaningfully accommodate religious employees and retaliated against them over their beliefs.

28.    Plaintiffs were targeted by Exxon's retaliatory behavior. They submitted clearly articulated religious exemption requests, explaining fully how their religious beliefs precluded them from receiving a COVID-19 vaccine. And Exxon affirmed the conflict between Plaintiffs' sincere religious beliefs that prevented vaccination, and further affirmed that accommodating them would not unduly burden the Company.[9]

---

[8] *See* Exhibit 3, Declaration of Donn Arizumi (Oct. 8, 2022).
[9] *See*, *e.g.*, Exhibit 1, Exxon Letter to Captain "Erikson" [sic] (July 27, 2022).

29.    But Exxon's late-provided "accommodations" were in name only.    In reality, Exxon not only constructively denied Plaintiffs' accommodation requests months after the fact, it rubbed salt in the wound by using the accommodation process itself as a means of retaliation through its "redesign" of Plaintiffs' duties.    The Company refused to consider either Plaintiffs' natural immunity (that the CDC had said was at least as strong as vaccine-induced immunity) or their willingness to test for COVID-19 as necessary.    (Unsurprisingly, no company has yet to explain how someone without COVID-19 can transmit COVID-19.)

30.    And by the time Exxon stepped up its retaliation (through, for example, reduction in Plaintiffs' annual performance ratings) in August of 2022, the Company knew that the vaccine had been ineffective at preventing the spread of the Omicron variant of COVID-19 throughout the Winter of 2021 and Spring of 2022.    In fact, at the same time Exxon was harassing Plaintiffs and attempting to pressure them to violate their religion, the Company knew that COVID-19 was being spread even (and maybe even especially) by employees who were already vaccinated.[10]

---

[10] Any immunity derived artificially through vaccination has been demonstrated to wane dramatically.  Indeed, research from one of the world's most prestigious medical institutions—the Cleveland Clinic—has demonstrated that the risk of contracting COVID-19 *increases with the number of vaccine doses received.*  Nabin K. Shrestha *et. al.,* MedRxiv, *Effectiveness of Coronvirus Disease (COVID-19) Bivalent Vaccine,* (Dec. 19, 2022), *available at* https://www.medrxiv.org/content/10.1101/2022. 12.17.22283625v1 (finding, in comprehensive study, that the risk "of COVID-19 increased with time since the most recent prior COVID-19 episode **and with the number of vaccine doses previously received**" (emphasis added)).

31.     And certainly, Exxon knew that forced vaccinations were inappropriate by late October of 2022 when it announced that, effective November 1, 2022, it would no longer require a COVID-19 vaccination for its Aviation employees.

32.     A company cannot recklessly impose an onerous new employment requirement without proper consideration of how to accommodate religious employees who would undoubtedly be affected by such a policy.  Imposing such a requirement, and then constructively denying accommodation requests and even using the accommodation process itself to retaliate against religious employees, is hardly a choice an employer is entitled to make.  This is especially true given that Exxon's retaliation and harassment came at a time when it was clear that the dominant COVID-19 variant (Omicron) was significantly less severe and at a time when vaccine *in*efficacy against the Delta and Omicron variants was crystal clear.

33.     More importantly, though, is that instead of legitimately considering costless options with the goal of accommodating Plaintiffs, Exxon leveraged people's livelihoods against their faith in order to further advertising or virtue signal or merely engage in rank discrimination.[11]  Exxon ignored costless ways to both accommodate Plaintiffs and follow federal employment law.

34.     Just because Exxon claims something does not make it so, of course.  The Company has claimed it accommodated Plaintiffs, while reality shows Exxon

---

[11] *See generally Sambrano v. United Airlines*, 45 F.4th 877, 879 (5th Cir. 2022) (Ho, J., concurring in denial of rehearing en banc) (The "real reason for the vaccine mandate . . . [wa]s 'virtue signaling' and 'currying political favor.'").

constructively denied their accommodation request and used the accommodation process as a pretext to retaliate against them for daring to exercise their rights and request an accommodation.

35.    Exxon's so-called accommodation was nothing short of a retaliatory maneuver, begrudgingly crafted to punish Plaintiffs after the fact for seeking to exercise their rights.  Plaintiffs' manager was frustrated with them for not following Exxon's directive on vaccination and for not heeding the warnings about their careers that he had been giving them for eight or nine months.  And so, in a thinly veiled act of hostility, the Company confined Plaintiffs to domestic routes, stripped them of supplemental duties, and then used these demotions to downgrade their performance ratings (even doing so retroactively), relegating them to diminished and isolated professional roles.

36.    Rather than engaging in a collaborative process to ensure a fair and effective accommodation, Exxon weaponized its exemption process to send an unmistakable message—failure to toe the company line comes at a steep price, and you will be punished for stepping out of line.  This approach violated not only anti-discrimination laws but also the basic tenets of respect and good faith required in the workplace.

## PARTIES

37.    Mr. Erickson resides in League City, Texas, and has worked for the Company since 2000, primarily as a corporate pilot, including as a manger/pilot and member of the leadership team until the Company retaliated against him.

38.    Mr. Clift resides in Willis, Texas, and has worked for the Company since 2000, primarily as a corporate pilot, including as chief pilot and scheduler during much of the COVID period until the Company retaliated against him.

39.    Mr. Neuman resides in Seabrook, Texas, and has worked for the Company since 2006, primarily as a corporate pilot.

40.    Exxon Mobil Corporation is an American corporation headquartered in Spring, Texas, within this district.

## JURISDICTION AND VENUE

41.    This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1331 as one arising under laws of the United States.

42.    Plaintiffs' claims for declaratory relief are authorized by 28 U.S.C. § 2201.

43.    Venue is proper in this Court under 42 U.S.C. § 2000e-5(f)(3) because the "unlawful employment practice[s]" giving rise to this lawsuit took place within this district.  All Plaintiffs live and work for Exxon in this district and Exxon is headquartered in this district.  Additionally, Plaintiff Paul Erickson resided in this division at all relevant times and this division is where he attends Mass and daily faced the decision whether or not to take the vaccine in order to prevent "career suicide."

## FACTUAL ALLEGATIONS

### A. *Background*

44.    In March 2020, the Severe Acute Respiratory Syndrome Coronavirus 2 ("SARS-CoV-2") prompted the institution of worldwide lockdowns and limitations on in-person interaction to slow the spread of the disease now known as COVID-19.

45.    On March 13, 2020, President Donald J. Trump declared a national emergency relating to the COVID-19 pandemic.  In response, many state and local governments issued "Stay at Home" orders for all non-essential workers, urging residents only to leave their homes for necessities.

46.    Exxon's workers were deemed to be essential, however, and continued working throughout the pandemic.

47.    Plaintiffs excelled as Company employees during this time (as they had previously), consistently obtaining high marks in annual performance reviews, being promoted, and enjoying the incentive stock awards that went along with such performance.  As evidenced by their advancement in the Company and annual employment records that earned them performance bonuses in the form of Company stock, their performance of their Company duties during the pandemic was exceptional.

### B. *Exxon's Vaccine Policy, Plaintiffs' Requests for a Religious Accommodation, and Exxon's Retribution*

48.    On December 8, 2021, Exxon notified its Aviation Services employees via email of its COVID-19 vaccination policy, indicating that it would require employees to be fully vaccinated by January 31, 2022.

49.     While absolute vaccine necessity was always a dubious proposition, the inefficacy of the vaccines at preventing the contraction and transmission of COVID-19 became increasingly clear in the months of November and December of 2021 as the Omicron variant became dominant (and well before Exxon rolled out its Mandate).  Exxon's own records will likely demonstrate that the Company was aware that the vaccines they mandated were not effective at stopping transmission of the virus during the relevant timeframes as companies across the country saw tremendous absenteeism at the end of 2021 and beginning of 2022 due to the Omicron variant that the COVID-19 vaccines were unable to stop the transmission of.

50.     Nevertheless, Exxon pressed forward with the implementation of its Mandate.

51.     The Mandate allowed employees to request religious accommodations from the mandate.  Exxon provided a "Request for Religious Exemption/Accommodation Related to COVID-19 Vaccine" (the "Form") for those seeking religious accommodation, to complete and submit before the forced vaccination deadline.[12]

52.     But Exxon then began its campaign of retaliation against religious employees, like Plaintiffs, pressuring them to either surrender their beliefs or suffer severe adverse consequences to their careers.

53.     Nevertheless, Exxon allowed the Plaintiffs to continue working unvaccinated for almost six months following the institution of the Mandate.  While

---

[12] *See, e.g.*, Exhibit 4, Paul Erickson Request for Religious Accommodation.

Jaubert did not appreciate their noncompliance, the Plaintiffs did not have any issues working during that time.

54.     Then, just a month or so following the performance review meetings for the previous cycle—April 2021 through March 2022—the Company suddenly determined that it needed to "accommodate" the Plaintiffs.  As detailed below, the unreasonable accommodation was a demotion of duties and artificially-imposed restrictions that Exxon could use as a pretext to withhold financial and career benefits from the Plaintiffs.  In August of 2022, long after every other company had abandoned the fool's errand of a vaccine mandate and after the CDC had changed its stance on mandatory vaccination, Exxon determined it was time to punish the Plaintiffs for their refusal of the COVID-19 vaccine.

### i.     *Captain Paul Erickson*

55.     Captain Erickson was hired by Exxon in February 2000 as a Corporate Aircraft Pilot.  Throughout his almost twenty-five-year career with the Company and prior to the Company's Mandate, his performance has always been assessed by Exxon as among the highest.  That is why in every year since 2006—and until the events that gave rise to this Complaint—Captain Erickson has received incentive stock awards from the Company as a reward for his high performance.

56.     Captain Erickson served as Standardization Captain for several years and was ultimately promoted to Chief Pilot in 2014.  In 2017, he was moved to Aviation Advisor.  Then, in April 2020, he was promoted to Safety, Security, Health, and Environmental (SSHE) Manager and Operations Integrity Manager (OIMS).

57.    In these roles, Captain Erickson has managed and supervised numerous Exxon pilots.

58.    Throughout his nearly twenty-five-year career with the Company and prior to the Company's Mandate, the Company always rated him as a high performer. For example, his Performance Discussion Summary (PDS) from 2021 is replete with praise.[13]   In this last PDS before the Company announced its Mandate, Captain Erickson's supervisor, JC Jaubert, placed him in the "Outstanding Perofrmance" category, commenting, "I informed Paul that his outstanding performance is based, not only, on the remarkable contributions in his first year in the current job [as SSHE Manager], but also combined with his Captain responsibilities."[14]

59.    On December 8, 2021, the Company notified Captain Erickson that he would be required to be fully vaccinated for COVID-19 or submit a request for a religious accommodation by January 31, 2022.

60.    Over the next several weeks, he met with his supervisor—the Manager of Aviation Services, Jean-Claude ("JC") Jaubert—multiple times regarding the Mandate.   During these conversations, Jaubert described the severe career implications of applying for a religious accommodation, warning of "career suicide." Jaubert asked Erickson not to seek an accommodation and described refusing to get the vaccine as professionally "slitting your wrists" (pantomiming the remark physically).   Jaubert also told Captain Erickson at one point: "Unless you get the

---

[13] Exhibit 5, 2021 PDS Summary for P. Erickson.
[14] *Id.*

vaccine, your performance 'Needs Improvement,'" a reference to one of the lowest categories in Exxon's annual performance review rankings.[15]

61.    Despite these harassing conversations designed to intimidate him, Captain Erickson submitted his request for religious accommodation on January 14, 2022, explaining his sincere religious beliefs that precluded him from receiving the COVID-19 vaccine.[16]

62.    In his request, Captain Erickson outlined the multiple religious reasons he had for being unable to receive the vaccine.  Among these were: (1) that as a Catholic, he "cannot receive a vaccine [like the COVID-19 vaccines] that is produced and/or tested from elements contributed from the abortion industry"; and (2) taking the COVID-19 vaccine would be "a violation of the body's sacred character and its supernatural purpose as a temple of God."[17]

63.    Unfortunately, Exxon continued to harass and intimidate Captain Erickson for exercising his rights and requesting an accommodation.  His supervisor continued over the next weeks and months to pressure him to get the vaccine, threatening that his job performance would "need improvement" if he did not take a vaccine.

64.    Then, at a dinner meeting in March with Jaubert and Charles Cone (a supervisor who replaced Jaubert after Jaubert retired), Captain Erickson was told:

---

[15] Exxon's performance category ratings are, in descending order: Outstanding/Distinction, Outstanding, Excellent, Very Good, Good, Needs Improvement, Needs Significant Improvement.
[16] *See id.*
[17] *Id.*

"Please think very seriously this weekend about the career implications of not being vaccinated—very, very, seriously, please." Throughout this period, Captain Erickson continued to respond to these intimidating remarks, stating that he was firm in his decision to follow his religious beliefs and remain unvaccinated.

65.    In the meantime, Captain Erickson continued performing his duties at Exxon without interruption, difficulty, or issue for more than six months while Exxon's vaccine mandate was in effect.

66.    On July 27, 2022, six months after he submitted his request, Jaubert pressed Captain Erickson yet again as to whether he had changed his mind. When Captain Erickson responded that he remained resolute, Jaubert handed him a letter that stated that his vaccine exemption request had been approved "based on [his] identified sincerely held religious belief" and that accommodating Captain Erickson did not "present an undue hardship to the business."[18]

67.    But the letter did not stop there. It went on to state (with more than a hint of vindictiveness) that the Company had chosen to "accommodate" Captain Erickson by "redesign[ing]" his "existing job role . . . to eliminate the need for COVID-19 vaccination."[19] This "redesign" meant that Captain Erickson's "flight assignments have been limited to domestic routes" only.[20] The Company was also making "changes to [his] supplemental duties . . . if those duties are impractical based on the nature of the duties [he was] to perform and limitations on [his] ability to effectively

---

[18] Exhibit 1, Exxon Letter to Captain "Erikson" [sic] (July 27, 2022).
[19] *Id.*
[20] *Id.*

perform them with [his] base role now limited to domestic routes."[21]  The letter also claimed that Captain Erickson's "accommodation" was reasonable and explicitly stated that it was not unduly burdensome to Exxon.

68.    The full adverse import of the veiled threats in the Company's letter to Captain Erickson soon became clear when Exxon took adverse actions against him soon after "granting" his accommodation in July of 2022.

69.    The letter informed Captain Erickson that he was demoted to domestic flights only (even though he could fly internationally and even though the Houston base only flew about 5% of its routes internationally anyway).

70.    Effective September 1, 2022, Captain Erickson was removed as SSHE Manager and OIMS Coordinator and demoted to Domestic Pilot/Captain.  Using his "domestic-only" flying status as a pretext for demoting him from SSHE Manager was especially vindictive.  Captain Erickson's primary role, *i.e.*, the duties to which he was to give the majority of his time, was as SSHE Manager—not as a pilot.  In that SSHE Management role, his "primary function" was to "[p]rovide[] direct support for the Manager of Aviation Services for expertise in Safety, Security, Health, Environmental and OIMS management"—not to fly.[22]

71.    Further confirming the pretextual nature of Exxon's actions, after demoting and removing Captain Erickson as SSHE Manager, the Company moved him from a separate, individual office into an open-air cubicle with other employees.

---

[21] *Id.*
[22] Exhibit 6, Exxon SSHE Job Description of May 1, 2020.

This was, of course, not the response of an employer concerned with the (alleged) safety risks posed by an unvaccinated employee, as this made it more likely that Captain Erickson would have regular contact with his colleagues. It was simply another calculated punishment for Captain Erickson built into the "accommodation" package Exxon provided.

72.    Jaubert also informed Captain Erickson that his annual performance rating for the *prior* reporting period (April 2021 – March 2022) was reduced to "Needs Improvement" based on the "redesign" of his job duties—suddenly down four levels from Outstanding/Excellent, which was the rating he had received for the previous twenty-two years of his career with the Company. This artificial devaluation of his ranking took place even though Captain Erickson had completed the previous ranking period prior to any "redesign" or accommodation being necessary.

73.    Captain Erickson then questioned the "Needs Improvement" ranking for the *previous* cycle (April 2021 – March 2022), because that cycle had included for him more collateral duty and high-visibility accomplishments (such as OIMS Internal Assessment Leadership/Facilitation) than he had ever achieved in his previous twenty-one years with the Company. Jaubert remained firm in the rating, and in the negative career implications about which Jaubert had warned Captain Erickson for months regarding the consequences of non-vaccination.

74.    What is more, in his comments in Captain Erickson's 2022 PDS, Jaubert justified his downgraded performance rating to "Performance Needs Improvement" on the grounds that Captain Erickson had been "limited to domestic routes since

February," and "the scope of his trips has not been the same of most of the other Captains in EMAS who do not have any restrictions to international destinations."[23]

75.    Jaubert's statement that Captain Erickson was limited to domestic only flights since "February" 2022 is inaccurate.  None of the Plaintiffs, including Captain Erickson, was informed of any such limitation until he received his "accommodation" letter in July or August of 2022.  Indeed, Captain Clift piloted an international flight in June of 2022, four months after the "February" deadline asserted by Jaubert.[24]

76.    Jaubert went on to comment that "[s]everal international locations currently have Immigration and Health requirements for Covid-19 unvaccinated individuals, making entry to such Countries and/or short-stay business trips, a required component of [Captain Erickson's] base role, unfeasible."[25]  This too is inaccurate, as Captain Erickson's base role (that is, the role in which he spent the majority of his time) at this time was as SSHE Manager, a role for which Jaubert had in the previous year praised him for "his outstanding performance" and "remarkable contributions in his first year" as SSHE Manager.[26]

77.    Shockingly, Jaubert went on to admit that the false and retaliatory "accommodation" of limited flight assignments, which Exxon pretextually forced on Plaintiffs, was being used as a means to downgrade Captain Erickson's performance rating and prevented him from being considered for career advancement: "At the

---

[23] Exhibit 7, 2022 PDS Summary for P. Erickson.
[24] *See* Exhibit 2 at 5, Exxon Position Statement to EEOC Regarding Charge of T. Clift (June 20, 2023).
[25] Exhibit 7, 2022 PDS Summary for P. Erickson.
[26] Exhibit 5, 2021 PDS Summary for P. Erickson.

same time, it is important to highlight that Paul would be a candidate for management/supervisory positions if above restrictions are lifted, based on his previous experiences in such roles in the past months & years."[27] This admission lays bare the undeniable link between Exxon's anti-religious bias and the adverse consequences to Captain Erickson's career, as the Company explicitly tied its discriminatory actions to his stalled advancement and diminished opportunities.

78.    Captain Erickson was also ranked "Needs Improvement" for the April 2022 – March 2023 reporting period, even though he continued to perform as SSHE Manager/OIMS Coordinator for half that reporting period (until September 2022) and was only limited to "Domestic Routes" as a pilot for a brief two months of the reporting period.

79.    Captain Erickson received neither an annual performance raise nor a cost-of-living adjustment ("COLA") for 2022 or 2023.  Nor did he receive the annual incentive stock grant in December of 2022, 2023, or 2024, as he had received every year for the previous sixteen years with the Company.[28]

80.    To add insult to injury, on October 24, 2022—barely a month and a half after the Company formally demoted Captain Erickson—he received notice that

---

[27] Exhibit 7, 2022 PDS Summary for P. Erickson.

[28] Captain Erickson, as well as all members of Exxon's aviation group, did receive an increase in salary—which the Company termed a "pilot market competitiveness adjustment"—in March of 2022 in order to keep Exxon's salary competitive.  This increase took place prior to the accommodation being granted and was awarded regardless of job duties or performance.

effective November 1, 2022, the Company would no longer require a COVID-19 vaccination for aviation employees.

81.    Captain Erickson filed charges with the EEOC on April 7, 2023, who reached out to Exxon for a position statement.[29]

82.    Exxon responded to the EEOC on June 8, 2023.[30]

83.    Because of Defendants' unlawful actions in denying him a reasonable accommodation—at least during August and September of 2022—and retaliating against him for requesting a religious accommodation, Captain Erickson has endured extreme emotional distress and continues to experience extreme emotional distress.

84.    After the EEOC was unsuccessful in resolving this case, a Notice of Right to Sue was issued to Captain Erickson on September 20, 2024.[31]

### ii.    *Captain Thomas Clift*

85.    Captain Clift was hired by Exxon in February 2000 as a Corporate Aircraft Pilot.  Throughout his almost twenty-five-year career with the Company and prior to the Company's Mandate, his performance has always been assessed by Exxon as among the highest.  That is why in every year since 2006—and until the events

---

[29] *See* Exhibit 8, Paul Erickson's EEOC Form 5 (April 7, 2023).
[30] Exhibit 9, Exxon Position Statement to EEOC Regarding Charge of P. Erickson (June 8, 2023).
[31] Exhibit 10, Notice of Right to Sue from EEOC to P. Erickson (Sep. 20, 2024).

that gave rise to this Complaint—Captain Clift has received incentive stock awards from the Company as a reward for his high performance.

86.    Captain Clift served in many additional positions for Exxon over his career, including as Safety Coordinator, Standardization Captain, C-FOQA Gatekeeper, OIMS Owner and Administrator as well Captain on numerous aircraft. He was promoted to Chief Pilot in 2020.

87.    In these roles, Captain Clift has managed and supervised numerous Exxon pilots.

88.    In December of 2021, the Company notified Captain Clift that he would be required to be fully vaccinated for COVID-19 or submit a request for a religious accommodation by January 31, 2022.

89.    Captain Clift informed his supervisor, Charles Cone, that he intended to request a religious accommodation to the Mandate. In conversation with Captain Clift, Mr. Cone suggested that the consequences of requesting and receiving an accommodation to the Mandate would negatively impact Captain Clift's career.

90.    At this suggestion, Captain Clift insisted that, should such negative consequences come, they should at least be limited to the next reporting period in which any performance limitations actually occurred (*i.e.*, April 1, 2022 – March 31, 2023). "Don't count on it," was Mr. Cone's response. "It may very well affect the current [reporting period] also." (The current reporting period was the April 2021 – March 2022 cycle that was about to be complete at the time and during which Captain Clift was not pretextually restricted by the company to domestic flights only.)

91.     Despite these conversations designed to pressure him against exercising his rights, Captain Clift requested a religious accommodation in January of 2022, explaining his sincere religious beliefs that precluded him from receiving the COVID-19 vaccine.[32]

92.     In his request, Captain Clift outlined the multiple religious reasons he had for being unable to receive the vaccine.  Among these were: (1) as a Christian he cannot support or participate in the act of abortion, which act was implicated by the use of "aborted fetal tissues/cells" in the development of the vaccines; and (2) putting the vaccine into his body would defile it as the temple of the Holy Spirit.[33]

93.     Unfortunately, Exxon continued to pressure Captain Clift concerning exercising his rights and requesting an accommodation.  After submitting his exemption request, Company managers informed Captain Clift that more senior managers were "unhappy that [you are] seeking an exemption" and that "there might be punishment associated with the exemption."

94.     In the meantime, though, Captain Clift continued performing his duties at Exxon without interruption, difficulty, or issue for more than six months while Exxon's vaccine mandate was in effect.

95.     On August 10, 2022, seven months after he submitted his request, Captain Clift was given a letter informing him that the Company had approved his

---

[32] *See* Exhibit 11, Thomas Clift Request for Religious Accommodation.
[33] *Id.*

exemption request "based on [his] identified sincerely held religious belief" and that accommodating Captain Clift did not "present an undue hardship to the business."[34]

96.    But the letter did not stop there.  It went on to state (with more than a hint of vindictiveness) that the Company had chosen to accommodate Captain Clift by "redesign[ing]" his "existing job role . . . to eliminate the need for COVID-19 vaccination."[35]  This "redesign" meant that Captain Clift's "flight assignments have been limited to domestic routes" only.[36]

97.    The Company was also making "changes to [his] supplemental duties . . . if those duties are impractical based on the nature of the duties [he was] to perform and limitations on [his] ability to effectively perform them with [his] base role now limited to domestic routes."[37]  The letter confirmed that none of these changes, which were part of Captain Clift's "reasonable" accommodation, were unduly burdensome to Exxon.

98.    The full adverse import of the veiled threats in the Company's letter to Captain Clift soon became clear when Exxon took adverse actions against him soon after "granting" his accommodation in August of 2022.

99.    The letter informed Captain Clift that he was demoted to domestic flights only (even though he could fly internationally—indeed he had recently done

---

[34] Exhibit 12, Exxon Letter to Captain Clift (August 10, 2022).
[35] *Id.*
[36] *Id.*
[37] *Id.*

so in June of 2022—and even though the Houston base only flew about 5% of its routes internationally anyway).

100.    Effective September 6, 2022, Captain Clift was demoted from Chief Pilot to Captain Pilot and embarrassingly removed from his own office space and assigned a shared, open-air cubicle.

101.    He was then informed that his annual performance rating for the *prior* reporting period (April 2021–March 2022, during which time he was the Chief Pilot) warranted a "Needs Improvement" ranking—suddenly down four levels from the high marks he had received for the previous twenty-four years of his career with the Company.  (But of course had his performance the previous cycle actually needed improvement, he would have been removed as Chief Pilot at least six months earlier—likely before.)

102.    Captain Clift received neither an annual, end-of-year performance raise nor a cost-of-living adjustment ("COLA") for 2022 or 2023.  Nor did he receive the annual incentive stock grant in December of 2022, 2023, or 2024, as he had received every year for the previous sixteen years with the Company.

103.    To add insult to injury, on October 24, 2022—barely a month and a half after the Company formally demoted Captain Clift—he received notice that effective November 1, 2022, the Company would no longer require a COVID-19 vaccination for aviation employees.

104.   Captain Clift filed charges with the EEOC on March 31, 2023, who reached out to Exxon for a position statement.[38]

105.   Exxon responded to the EEOC on June 20, 2023.[39]

106.   Because of Defendants' unlawful actions in denying him a reasonable accommodation—at least during August and September of 2022—and retaliating against him for requesting a religious accommodation, Captain Clift has endured extreme emotional distress and continues to experience extreme emotional distress.

107.   After the EEOC was unsuccessful in resolving this case, a Notice of Right to Sue was issued to Captain Clift on September 20, 2024.[40]

### iii.   Captain Craig Neuman

108.   Captain Neuman was hired by Exxon in 2006 as a Corporate Aircraft Pilot.  Since that time, he has served in many additional positions for Exxon over his career, some formal some informal, including Deputy Standards Captain, C-FOQA Gatekeeper, and Training Coordinator Captain.

109.   Throughout his nearly twenty-year career with the Company and prior to the Company's Mandate, the Company always rated him as a high performer.  For example, his Performance Discussion Summaries (PDS) from 2018 thru 2021 (the last PDS before the Company's Mandate) are replete with praise.[41]  In his 2020 PDS, the

---

[38] *See* Exhibit 13, Thomas Clift's EEOC Form 5 (March 31, 2023).
[39] Exhibit 2, Exxon Position Statement to EEOC Regarding Charge of T. Clift (June 20, 2023).
[40] Exhibit 14, Notice of Right to Sue from EEOC to T. Clift (Sep. 20, 2024).
[41] Exhibits 15–18, 2018–2021 PDS Summaries for C. Neuman.

Company rated Captain Neuman's performance as "Good,"[42] and in his last PDS before the Company announced its Mandate, Exxon rated his performance as "Very Good."[43]

110.    In December of 2021, the Company notified Captain Neuman that he would be required to be fully vaccinated for COVID-19 or submit a request for a religious accommodation by January 31, 2022.  Captain Neuman informed his supervisor, Charles Cone, that he intended to request a religious accommodation to the Mandate.

111.    Captain Neuman requested a religious accommodation on January 21, 2022, explaining his sincere religious beliefs that precluded him from receiving the COVID-19 vaccine.[44]

112.    In his request, Captain Neuman outlined the multiple religious reasons he had for being unable to receive the vaccine.  Among these were: (1) that based on his "personal relationship with Jesus" he understood taking the COVID-19 vaccine would "violate the commandments set forth by God," in part because his "body [is] a temple of the Holy Spirit"; and (2) he could not take the vaccine because of "the involvement of stem cell lines used in the COVID vaccine" that tied them to the sin of abortion.[45]  According to Captain Neuman's understanding, the requirements of

---

[42] Exhibit 17.
[43] Exhibit 18.
[44] *See* Exhibit 19, Craig Neuman Request for Religious Accommodation.
[45] *Id.*

his religion "conflict[] with the company's requirement" to get the COVID-19 vaccine.[46]

113.    After submitting his request, Captain Neuman was warned by Mr. Cone that there would be adverse repercussions for exercising his rights and requesting a religious accommodation to the Mandate.  Mr. Cone did not specify at the time what those adverse repercussions would be but expressed that they were certain to follow if Captain Neuman persisted in seeking an exemption.

114.    Unfortunately, Exxon continued to harass and intimidate Captain Neuman for exercising his rights and requesting an accommodation.  Even after submitting his exemption request, Mr. Cone pressed him as to whether he was willing to "change his mind" given "the risk of losing [his] job . . . should he retain [his] stance against the vaccine," and further whether he was "willing to lose his job over this."

115.    In the meantime, Captain Neuman continued to perform his job without issue for more than six months while Exxon's vaccine mandate was in effect and before the Company took formal adverse action against him.

116.    On August 12, 2022—seven months after he submitted his request and more than six months after Exxon's Mandate went into effect—Captain Neuman was given a letter informing him that the Company had approved his exemption request "based on [his] identified sincerely held religious belief" and that accommodating Captain Neuman did not "present an undue hardship to the business."[47]

---

[46] *Id.*
[47] Exhibit 20, Exxon Letter to Captain Neuman (August 12, 2022).

117.    But the letter did not stop there.  It went on to state (with more than a hint of vindictiveness) that the Company had chosen to accommodate Captain Neuman by "redesign[ing]" his "existing job role . . . to eliminate the need for COVID-19 vaccination."[48]  This "redesign" meant that Captain Neuman's "flight assignments have been limited to domestic routes" only.[49]

118.    The Company was also making "changes to [his] supplemental duties . . . if those duties are impractical based on the nature of the duties [he was] to perform and limitations on [his] ability to effectively perform them with [his] base role now limited to domestic routes."[50]  The letter confirmed that none of these changes, which were part of Captain Neuman's "reasonable" accommodation, were unduly burdensome to Exxon.

119.    The full adverse import of the veiled threats in the Company's letter to Captain Neuman soon became clear when Exxon took adverse actions against him soon after "granting" his accommodation in August of 2022.

120.    The letter informed Captain Neuman that he was demoted to domestic flights only (even though he could fly internationally and even though the Houston base only flew about 5% of its routes internationally anyway).

121.    He was informed that his annual performance rating for the *prior* reporting period (April 2021 – March 2022) was reduced to "Needs Improvement"— suddenly down from high marks he had received for the previous sixteen plus years

---

[48] *Id.*

[49] *Id.*

[50] *Id.*

of his career with the Company.  This downgrade came even though he (like the other Plaintiffs) was not restricted in his flying or duties at any time during the previous reporting period of April 2021 – March 2022.

122.   What is more, the Company justified his downgraded performance rating by citing the false and retaliatory "accommodation" of limited flight assignments, which it had pretextually forced on Plaintiffs: "Craig's role was significantly impacted by constraints causing him to be limited to domestic flight assignments."[51]

123.   The Company also downgraded Captain Neuman's rating for the April 2022 – March 2023 reporting cycle to "Needs Improvement."  Again, the Company cited "limitations to his job role . . . result[ing] in his trip assignments being primarily limited to domestic operations" as justification for the reduced rating.[52]  Even though the Company's false and retaliatory "accommodation" of domestic-only flight assignments had only been applied to Plaintiffs for a roughly six-week period in the fall of 2022, the Company used this limitation to justify unfairly downgrading Captain Neuman's performance ratings for two full years—negatively impacting his reputation, career trajectory, and compensation—one of which had been completed long before the false "accommodation" was given for the senseless Mandate.

124.   By leveraging a temporary and unjustified restriction that the Company imposed on itself, Exxon sought to create a false narrative of diminished performance

---

[51] Exhibit 21, 2022 PDS Summary for C. Neuman.
[52] Exhibit 22, 2023 PDS Summary for C. Neuman.

to justify punitive actions against Captain Neuman. This not only ignored Captain Neuman's decades of exemplary service but also revealed the Company's broader intent to punish Plaintiffs for asserting their rights to religious accommodations. The downgrade was neither rooted in legitimate performance concerns nor supported by operational realities—it was, instead, a calculated effort to marginalize and penalize Captain Neuman for seeking to maintain his religious beliefs in the workplace.

125.    As a result of the Company's actions, Captain Neuman received neither an annual performance raise nor a cost-of-living adjustment ("COLA") for 2022 or 2023. And but for the pretextual downgrade of his performance rating, Captain Neuman would have received an annual incentive stock grant in December of 2022 and 2023, just like he had for years prior to the events described in this Complaint.

126.    To add insult to injury, on October 24, 2022—barely a month and a half after the Company formally demoted Captain Neuman—he received notice that effective November 1, 2022, the Company would no longer require a COVID-19 vaccination for aviation employees.

127.    Captain Neuman filed charges with the EEOC on May 12, 2023, who reached out to Exxon for a position statement.[53]

128.    Exxon responded to the EEOC on July 12, 2023.[54]

129.    Because of Defendants' unlawful actions in denying him a reasonable accommodation—at least during August and September of 2022—and retaliating

---

[53] Exhibit 23, Craig Neuman's EEOC Form 5 (March 31, 2023).
[54] Exhibit 24, Exxon Position Statement to EEOC Regarding Charge of C. Neuman (July 12, 2023).

against him for requesting a religious accommodation, Captain Neuman has endured extreme emotional distress and continues to experience extreme emotional distress.

130.    After the EEOC was unsuccessful in resolving this case, a Notice of Right to Sue was issued to Captain Neuman on September 20, 2024.[55]

## C.    *Reasonable Accommodation Options Unjustifiably Rejected by Exxon*

131.    Exxon could have meaningfully accommodated Plaintiffs' sincere religious beliefs without undue hardship (indeed, with no cost whatsoever).  But Exxon failed to engage in the interactive process to legitimately consider all possible accommodations.

132.    This caused Exxon to overlook accommodations posing less than a substantial burden including: (1) acknowledging that Plaintiffs' natural immunity satisfied Exxon's immunization requirements (or, at least, the supposed reason behind it since natural immunity is superior to vaccine-induced immunity); (2) weekly testing for COVID-19; (3) masking and other enhanced safety protocols; (4) scheduling around vaccine-only countries for religious pilots; (5) increasing Plaintiffs non-flying, collateral, and office-based duties, (6) allowing them to swap schedules with other pilots in the *highly* unlikely event they were scheduled to fly to a country they were absolutely prohibited from entering (assuming such country existed at the time, which Plaintiffs do not believe was the case); or (7) any combination of the above.

---

[55] Exhibit 25, Notice of Right to Sue from EEOC to C. Neuman (Sep. 20, 2024).

133.    The "domestic only" flying restriction was neither necessary nor reasonable, especially when Exxon used it as a basis to downgrade Plaintiffs' performance rankings.

134.    Critically, because of *demonstrated vaccine inefficacy* at the time, testing was a more reliable indication of safety than mandating vaccination.

135.    And Plaintiffs would have personally incurred all costs related to COVID-19 testing.

136.    Regardless, as early as December 3, 2021, the White House had announced plans for full reimbursement of COVID-19 testing costs for employers.[56]

137.    On January 10, 2022—prior to Exxon's deadline for compliance with the Mandate—President Biden's Department of Health and Human Services ("HHS") announced that as of January 15, 2022, all health insurers would be required to cover the full cost of at-home COVID-19 testing.[57]

138.    Tellingly, Exxon evidently used some form of these accommodation measures to accommodate others who worked for the Company such as in offshore capacities.

139.    Moreover, at the time Exxon began harassing Plaintiffs, the CDC had conclusively stated that individuals vaccinated for COVID-19 could nevertheless

---

[56] *See* CNBC, *How to get the free at-home COVID tests promised by the White House,* (December 3, 2021) https://www.cnbc.com/2021/12/03/how-to-get-the-free-at-home-covid-tests-promised-by-white-house-.html (last visited Dec. 18, 2024).

[57] *See* U.S. Department of Health and Human Services Press Release, *available at* https://www.hhs.gov/about/news/2022/01/10/biden-harris-administration-requires-insurance-companies-group-health-plans-to-cover-cost-at-home-covid-19-tests-increasing-access-free-tests.html (last visited Dec. 18, 2024).

contract and spread COVID-19, which Exxon cannot dispute. On March 29, 2021, the Director of the CDC Rochelle Walensky claimed that "vaccinated people do not carry the virus, don't get sick."[58] But because the real-world data already demonstrated breakthrough infections in the vaccinated just three months after the Pfizer-BioNTech vaccine received FDA approval, the CDC immediately thereafter clarified Director Walensky's statements and confirmed that vaccinated individuals do in fact become infected and spread the virus to others.[59]

140.    Before instituting the Mandate, Exxon knew or should have known that the vaccines were largely ineffective at controlling the spread of COVID-19. As early as July 2021, Director Walensky admitted that the vaccinated had similarly high viral loads of SARS-CoV-2 as the unvaccinated and thus could still contract and spread the Delta variant.[60]

---

[58] *Statement from CDC Director Rochelle P. Walensky, MD, MPH on* Rachel Maddow Show (March 29, 2021), *transcript available at* https://www.msnbc.com/transcripts/transcript-rachel-maddow-show-3-29-21-n1262442?utm_content=buffer7fb12&utm_medium=Arianna&utm_source=LinkedIn&utm_campaign =Buffer.

[59] *See CDC Reverses Statement by Director* (Apr. 2, 2021), *available at* https://thehill.com/changing-america/well-being/546234-cdc-reverses-statement-by-director-that-vaccinated-people-are-no/.

[60] *Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR*, CDC News Room (July 30, 2021), *available at* https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html [https://perma.cc/VR5V-E67A] ("Today, some of those data were published in CDC's Morbidity and Mortality Weekly Report (MMWR), demonstrating that Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people. High viral loads suggest an increased risk of transmission and raised concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus.").

141.    In August 2021, a joint study by CDC and the Wisconsin Department of Health services further confirmed Director Walensky's admission; the study indicated that vaccinated individuals had a 5% higher viral load than the unvaccinated and were not only just as likely to transmit the virus as the unvaccinated, but posed a greater contagion risk due to the increased likelihood of asymptomatic infection.[61]

142.    But underscoring the irrationality of Exxon's continued pursuit of enforcing its Mandate against religious employees, the Company refused to recognize natural immunity as satisfying its immunization requirement.  This is so even though the CDC had already confirmed—prior to Exxon's Mandate taking effect—that a prior COVID-19 infection provides protection superior to a vaccine alone.[62]

143.    This also took place despite the fact that the international scientific community has conclusively established through centuries of research that natural immunity is superior to vaccine-elicited immunity.[63]  In the context of COVID-19, natural immunity's desirable relative efficacy has been repeatedly confirmed in the

---

[61] *See* Kasen Riemersma, *et. al*, *Shedding of Infectious SARS-CoV-2 Despite Vaccination*, medRxiv (Aug. 24, 2021), *available at* https://www.medrxiv.org/content/10.1101/2021.07.31.21261387v4.full.pdf.

[62] CDC, *COVID-19 Cases and Hospitalizations by COVID-19 Diagnosis—California and New York, May–November 2021*, https://www.cdc.gov/mmwr/volumes/71/wr/mm7104e1.htm?s_cid=mm7104e1_w ("CDC Report") (noting that "[b]y October [of 2021], persons who survived a previous infection had lower case rates than persons who were vaccinated alone").

[63] *See Plotkin's Vaccines*, 7th Edition, at Section 2.

scientific literature.[64]  Even Dr. Anthony Fauci previously stated that prior infection is the most effective means of immunization.[65]  That should be unsurprising given that vaccine-based immunization is an artificial attempt to emulate the mechanisms of natural immunity.  This is a fundamental premise of immunological research, which, as a sophisticated international corporation, Exxon was undoubtedly aware of when it carried out its pressure campaign against Plaintiffs (and long before then, too).

144.  In what should have been an unsurprising revelation, global data demonstrates that COVID-19 infection rates are higher among vaccinated individuals who do not possess natural immunity than unvaccinated individuals with natural immunity.[66]  This follows previous studies such as a Cleveland Clinic study published in June 2021 that measured the cumulative incidence of SARS-CoV-2 infection among 52,238 vaccinated and unvaccinated health care workers over a five-month period, and found that none of the 1,359 previously infected who remained unvaccinated contracted SARS-CoV-2 over the course of the research, despite a high background rate of COVID-19 in the hospital.[67]  In a May 2021 study from Ireland, researchers conducted a review of eleven cohort studies involving over 600,000 total

---

[64] *See, e.g.,* The Lancet, *Past SARS-CoV-2 infection protection against re-infection: a systematic review and meta-analysis* (Feb. 16, 2023), *available at* https://www.thelancet.com/article/S0140-6736(22)02465-5/fulltext.

[65] *See* https://www.youtube.com/watch?v=s8c_Py1wgGc (explaining that "the best vaccination is to get infected yourself") (last visited Dec. 18, 2024).

[66] CDC Report, *supra* note 52.

[67] Nabin K. Shrestha, *et al.*, *Necessity of COVID-19 vaccination in previously infected individuals*, medRxiv (June 19, 2021), *available at* https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v3.

recovered COVID-19 patients who were followed up with for over 10 months and found that reinfection in all studies was "an uncommon event" and explained that there was "no study reporting an increase in the risk of reinfection over time."[68]

145.    In short, Exxon's decision to ignore the possibility of natural immunity as satisfying the Company's immunization requirement, and its use of the accommodation process as a pretext to punish Plaintiffs, cannot be attributed to benign incompetence—it can only be attributed to ulterior motives such as rank religious discrimination.

146.    The Company's own business records will demonstrate that its vaccinated employees were contracting COVID-19 at incredibly high rates during the relevant timeframes, likely at even higher rates than its unvaccinated employees who, like Plaintiffs, possessed natural immunity.

147.    Further discovery here will also likely reveal that numerous Exxon employees alerted management of the issues discussed above.

148.    At the time Exxon began retaliating against Plaintiffs (and before), these facts relating to vaccinated persons and overall infection rates were available and known to Exxon.  At the least, Exxon should have made itself aware of such information prior to creating a forced medical treatment regime for its employees, particularly when it knew that the policy was going to conflict with the religious beliefs of individuals in its workforce.

---

[68] Eamon Murchu, *et al.*, *Quantifying the risk of SARS-CoV-2 reinfection over time*, Reviews of Medical Virology (May 27, 2021), *available at* https://pubmed.ncbi.nlm.nih.gov/34043841/.

149. Even worse, at the time Exxon imposed the Mandate, the COVID-19 vaccines were designed with the genetic sequencing of the original Wuhan strain of the SARS-CoV-2 virus, *not the subsequent variants.* Indeed, COVID-19 vaccines containing the genetic sequencing for later variants did not become available until September 1, 2022—seven months after Exxon's deadline and after Exxon had already demoted Plaintiffs and *ex post* downgraded their annual performance ratings.[69]

150. At the time of Exxon's Mandate, the SARS-CoV-2 virus had mutated drastically from the original Wuhan strain (upon which the COVID-19 vaccines were designed) resulting in the B.1.617.2 variant ("Delta") becoming the globally dominant strain in June 2021, and later the B.1.1.529 variant ("Omicron") in December of 2021.[70]

151. Delta has at least thirteen mutations from the original Wuhan strain of SARS-CoV-2, impacting the ability for antibodies from prior SARS-CoV-2 variants,

---

[69] *See* CDC, *CDC Recommends the First Updated COVID-19 Booster*, *available at* https://www.cdc.gov/media/releases/2022/s0901-covid-19-booster.html (last visited Dec. 18, 2024).

[70] Berkely Lovelace, Jr., *WHO says delta is becoming the dominant Covid variant globally*, CNBC (June 18, 2021) https://www.cnbc.com/2021/06/18/who-says-delta-is-becoming-the-dominant-covid-variant-globally.html; Jorge Quarleri et al., *Omicron variant of the SARS-CoV-2: a quest to define the consequences of its high mutational load*, GeroScience at 53–56 (Feb. 2022) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8683309/; *U.S. CDC estimates Omicron variant to be 58.6% of cases, revises projection*, Reuters (Dec. 28, 2021) https://www.reuters.com/world/us/omicron-estimated-be-586-coronavirus-variants-us-cdc-2021-12-28/.

such as the Wuhan strain used in the COVID-19 vaccines, from neutralizing infection.[71]

152.   That is why Exxon's vaccinated employees likely contracted Delta at the same or greater rates than its unvaccinated employees during Delta's dominant period from June 2021 through November 2021, and Omicron at the same or greater rates during Omicron's dominant period from December 2021 through March 2022. Thus, Exxon's continued pursuit of its compulsory vaccination mandate for a vaccine that was already demonstrating dramatic inefficacy, shows that the subsequent selective enforcement here was pretext to punish certain disfavored religious employees and not achieve any heightened safety or operational goal.

153.   On November 26, 2021, the WHO designated the B.1.1.529 variant ("Omicron") as a variant of concern, and by December 25, 2021, had become the dominant strain in the United States, accounting for 58.6% of all cases according to CDC data.[72]

---

[71] *Expert reaction to cases of variant B.1.617 (the 'Indian variant') being investigated in the UK*, Science Media Centre (Apr. 19, 2021); https://www.sciencemediacentre.org/expert-reaction-to-cases-of-variant-b-1-617-the-indian-variant-being-investigated-in-the-uk/; *SARS-CoV-2 variants of concern as of 24 May 2021*, European Centre for Disease Prevention and Control, (Aug. 6, 2021) https://www.ecdc.europa.eu/en/covid-19/variants-concern.

[72] Jorge Quarleri et al., *Omicron variant of the SARS-CoV-2: a quest to define the consequences of its high mutational load*, GeroScience at 53-56 (Feb. 2022) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8683309/; *U.S. CDC estimates Omicron variant to be 58.6% of cases, revises projection*, Reuters (Dec. 28, 2021), https://www.reuters.com/world/us/omicron-estimated-be-586-coronavirus-variants-us-cdc-2021-12-28/.

154. Omicron has fifty mutations from the original Wuhan strain, thirty-two of which pertain to the spike protein, the very mechanism relied upon by the COVID-19 vaccines to neutralize the virus.[73]

155. Thus, as recognized by the CDC, when Exxon took adverse employment actions against Plaintiffs, the Company's policy was imposing an obsolete vaccine that did not prevent the dominant variant at the time (Omicron) and was particularly inferior to the protection conferred by natural immunity.[74]

156. That was why other companies began suspending their mandated medical treatment programs after the Omicron variant revealed the inefficacy of the vaccines at the time.[75]

157. And it had been known for some time that vaccine efficacy significantly wanes over time. Indeed, the odds of an infection for individuals only vaccinated with a primary series was thirteen times greater than for individuals with natural immunity.[76]

---

[73] Rekha Khandia et al., *Emergence of SARS-CoV-2 Omicron (B.1.1.529) variant, salient features, high global health concerns and strategies to counter it amid ongoing COVID-19 pandemic*, Environmental Research (June 2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8798788/.

[74] CDC Report, *supra* note 1 (noting that "[b]y October [of 2021], persons who survived a previous infection had lower case rates than persons who were vaccinated alone").

[75] *See United Airlines Rolls Back Vaccine Requirements for Employees*, The Texan (Mar. 14, 2022), https://thetexan.news/united-airlines-rolls-back-vaccine-requirements-for-employees/; Kate Gibson, *More big companies are dropping vaccine requirement for workers*, CBS News (Feb. 17, 2022), https://www.cbsnews.com/news/covid-19-vaccine-requirement-workers-adidas-intel-starbucks/.

[76] Sivan Gazit, *et al.*, *Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections*, MEDRXIV [preprint] (Aug. 25, 2021), https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.

158.    These findings should not be surprising given that vaccines, by design, are an artificial attempt to emulate the immunity created by a natural infection.[77] That is why vaccines have never been able to achieve the same level of protection afforded by natural infection from a virus.[78]   Again, through centuries of research, the scientific community has confirmed that vaccines universally confer inferior immunity to having had the actual virus, and even the best vaccines do not confer immunity to all recipients.[79]   In those who do obtain simulated immunity from vaccination, the immunity created wanes over time,[80] as has been repeatedly demonstrated in the case of the COVID-19 vaccines.

159.    Moreover, Exxon never required booster shots for its employees and thus did not force them to receive the additional vaccines that the CDC was recommending at the time.   Exxon only required the outdated primary series of each vaccine—a poor substitute for natural immunity.   Given the odds of an infection being thirteen times greater for those only vaccinated with a primary series, the vaccinated-but-unboosted employees Exxon allowed to fly internationally may have been *more* likely statistically to contract and transmit COVID-19 than individuals such as Plaintiffs.

160.    While Exxon may claim it was only "following the science," as relayed by the CDC, the evidence shows otherwise.   Not only did it ignore natural immunity after the CDC recognized it, the Company did not institute a booster requirement for

---

[77] *See* Plotkin's Vaccines, 7th Edition, at Section 2.
[78] *Id.*
[79] *Id.*
[80] *Id.*

its employees, despite the CDC's recommendation that individuals receive booster shots.[81]

161.    Tellingly, the CDC never took adverse employment actions against any unvaccinated employee, and it stopped requiring the vaccine or even asking employees their COVID-19 vaccination status as of January 24, 2022—*a week before Exxon even put its Mandate into effect*.[82]

162.    It seems Exxon only selectively follows CDC guidance when doing so furthers discriminatory policies.

163.    Recognizing Plaintiffs' natural immunity to COVID-19 as an alternative to vaccination would have required no cost or action of Exxon and would have imposed no logistical or administrative burden on the Company.

164.    Nevertheless, despite the commonly understood scientific reality of natural immunity, Exxon harassed and pressured Plaintiffs while refusing to acknowledge their natural immunity as satisfying the Mandate.  This obvious solution would have significantly decreased the disruption caused by Exxon's discriminatory application of the Mandate.  Recognition of natural immunity was an option that would have actually *saved Exxon significant costs,* as it would have eliminated at least the costs associated with  shifting schedules and flight routes due to unvaccinated employees, and would have eliminated any purported costs associated with accommodating its naturally immune unvaccinated employees.

---

[81] *See* CDC Guidance on COVID-19 Boosters, *available at* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html.
[82] *See* Exhibit 26, CDC Response to FOIA Request (Dec. 2, 2022).

165. Alternatively, periodic COVID-19 testing would also have been a costless accommodation. As the CDC recognized in August of 2021, COVID-19 vaccines work "with regard to severe illness and death—they prevent it. But what they can't do anymore is prevent transmission."[83] Yet someone who does not have COVID-19 cannot infect someone with COVID-19—thus testing was the safest option and one that Plaintiffs were willing to do.

166. To be sure, because vaccinated individuals may also contract and transmit COVID-19, a negative COVID-19 test is a more reliable indication of safety from the virus than a vaccination at some earlier time. This fact was also well-known at the time Exxon failed to accommodate Plaintiffs and should have been considered as a reasonable accommodation to the vaccine mandate.

167. Having Plaintiffs wear a mask was another possible reasonable accommodation. As vaccine manufacturer Janssen (J&J) demonstrated, religiously exempt employees may be accommodated without increased risk or cost through masking.

168. Scheduling around the small number of countries requiring vaccines for pilots was another reasonable accommodation option, especially since the Company regularly made such scheduling modifications anyway. In fact, such modifications were an expected part of Exxon Aviation Services' typical operations, as Captain Clift knew well because he served as flight scheduler through the period leading up to

---

[83] Statement by Rochelle Walensky, U.S. Centers for Disease Control, CNN Interview (Aug. 5, 2021), *available at* https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html.

August 2022.  At any given time, the first-class FAA medical certifications for a number of Exxon pilots (sometimes as many as half) had lapsed into second-class certifications.  The Company understood that these pilots were ineligible to pilot flights to certain countries because those countries required first-class medical certifications for entering pilots.  Exxon never arbitrarily limited pilots with second-class medical certifications to domestic only and never otherwise retaliated against these pilots simply for being ineligible to fly to any and all international destinations at any time.  Instead, the Company adjusted its schedule such that pilots without a first-class medical were not assigned to countries requiring such certifications.  This allowed Exxon to continue to rely on and schedule these pilots for flights to the international destinations for which they were eligible to travel.[84]

169.    Being intimately familiar with this regular scheduling practice, Captain Clift suggested this accommodation option to his supervisor, Chuck Cone, when Cone informed him that he was being limited to domestic flights only.  Captain Clift told Mr. Cone, "I can take up slack in other places," (*i.e.*, destinations that did not require a vaccine).  But Mr. Cone responded, "Well, JC doesn't see it that way"—referring to JC Jaubert, Manager of Aviation Services.  Such a response further shows Exxon's retaliatory intent because Captain Clift had in fact proven that this accommodation was possible when he piloted an international flight to the Bahamas in June, barely

---

[84] As *Groff* points out, a company should also consider allowing the accommodated individuals to seek out schedule adjustments on their own through voluntary schedule swapping.  *Groff v. DeJoy*, 600 U.S. 447, 473 (2023).  Rather than pursue this avenue, Exxon jumped straight to an unreasonable accommodation (fashioned as a punishment for Plaintiffs).

a month before the Company "accommodated" him by unnecessarily limiting him to domestic flights only.[85]

170.  As another option, the Company could have increased Plaintiffs non-flying, collateral, and office-based duties.  Exxon regularly did this (without any punitive action) for pilots who were limited in flight destinations or even barred from flying altogether due to disability.  Exxon never downgraded the performance ratings of these pilots—even when they were ineligible to fly for extended periods—for being limited or unable to pilot flights.  Instead, the Company assigned them non-flying, collateral, and office-based duties which allowed them to continue to contribute despite their limitation.  It is known that some of these pilots even saw an *upgrade* in their performance rankings for evaluation periods in which they were unable to fly *at all*.  And this makes sense, because increased performance rankings often accompanied increased responsibility, which is not necessarily tied to flight duties, but is usually tied to collateral responsibilities.

171.  This fact further highlights the Company's retaliatory intent and behavior against Plaintiffs.  Instead of giving Plaintiffs additional, non-flight responsibilities after unnecessarily limiting their flying status, the Company used the limitation as an excuse to *remove and demote* them from non-flying positions and duties in which Plaintiffs *were already serving* and excelling.  The Company purposefully did so, of course, to deprive Plaintiffs of performance opportunities

---

[85] *See* Exhibit 2 at 5, Exxon Position Statement to EEOC Regarding Charge of T. Clift (June 20, 2023).

through collateral responsibilities that would have *increased* Plaintiffs' performance ratings—exactly what the Company did not want.

172.    Finally, the most straightforward accommodation available to Exxon in August of 2022 was to do nothing and to have Plaintiffs do nothing.  The pilots had been working for six months unvaccinated while the Mandate was in effect and had not experienced any issues.  They needed only to be left alone.

173.    In short, multiple costless accommodations were available to Exxon—and testing would have been an even safer option that what the Company ended up going with: vax (with an outdated vaccine) and release (onto offshore assets without other mitigation measures in place).

174.    Instead, Exxon invented an "accommodation" for Plaintiffs that could then be used against them as a pretextual basis for downgrading their performance reviews and costing them dearly in their careers—just like Exxon's managers had promised for months would happen if the Plaintiffs did not acquiesce to the Company's dictate.

## APPLICABLE LAW

175.    Title VII prohibits Exxon from discriminating against employees based on their religion.  42 U.S.C. § 2000e-2(a)(1).  This "include[s] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that it is unable to reasonably accommodate an employee's . . . religious observance or practice

without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

176.    In other words, "[a]n employer has the statutory obligation to make reasonable accommodations for the religious observances of its employees, but is not required to incur undue hardship." *Weber v. Roadway Express, Inc.*, 199 F.3d 270, 273 (5th Cir. 2000). Showing more than a de minimis cost does not suffice to establish undue hardship under Title VII. Rather, undue hardship exists only when a burden is substantial in the overall context of an employer's business. *Groff*, 600 U.S. at 468.

177.    This allows a plaintiff to raise claims of religious discrimination under a failure-to-accommodate theory if they fail to provide a reasonable accommodation from an employment requirement. *See Hebrew v. Tex. Dep't of Crim. Justice*, 80 F.4th 717, 724 (5th Cir. 2023). The "employer may not make an applicant's religious practice, confirmed or otherwise, a factor in employment decisions." *Id.*

178.    Title VII also prohibits Exxon from retaliating against an employee for engaging in protected activity. *See Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004).[86]

---

[86] Exxon was additionally in violation of Texas Executive Order GA-40, issued on October 11, 2021, because Exxon is an "entity in Texas" that was "compel[ling] receipt of a COVID-19 vaccine" by an employee "who objects to such vaccination . . . based on a religious belief."

## CAUSES OF ACTION

## COUNT ONE:

## TITLE VII – RELIGIOUS DISCRIMINATION – FAILURE TO ACCOMMODATE
(42 U.S.C. § 2000e-2(a)(1))

179.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

180.   An employee may assert a claim under Title VII for his employer's failure to accommodate his sincere religious beliefs, so long as the accommodation does not impose undue hardship on the employer. *See Antoine v. First Student, Inc.*, 713 F.3d 824, 831 (5th Cir. 2013).

181.   To establish a *prima facie* claim for failure to accommodate a plaintiff must present evidence that: "(1) 'that he had a *bona fide* religious belief that conflicted with an employment requirement'; (2) 'that he informed the employer of his belief'; and (3) 'that he was discharged [or otherwise faced an adverse employment action] for failing to comply with the conflicting employment requirement.'" *Id.* (quoting *Weber v. Roadway Express, Inc.*, 199 F.3d 270, 273 (5th Cir. 2000)).

182.   Once the plaintiff has made out a *prima facie* case for discrimination, the burden shifts to the employer to show that it either reasonably accommodated the employee or that it could not have reasonably accommodated the plaintiff's religious needs without undue hardship. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68–69 (1986).

183.   "Whether an accommodation is reasonable is a question of fact." *Antoine*, 713 F.3d at 831 (citing *Turpen v. Mo.-Kan.-Tex. R.R. Co.*, 736 F.2d 1022,

1026 (5th Cir. 1984) ("We must uphold the district court's factual determinations on the interlocking issues of 'reasonable accommodation' and 'undue hardship' unless they appear clearly erroneous.")).

184.    Importantly here, "Title VII requires that an employer reasonably accommodate an employee's practice of religion, not merely that it assess the reasonableness of a particular possible accommodation or accommodations." *Groff*, 600 U.S. at 473.    In other words, it is not enough for an employer to unilaterally determine that one option may constitute an undue hardship when other options may be able to work around the employer's concerns.    *Id.*

185.    Plaintiffs clearly established their "bona fide religious belief" and its conflict with the Mandate when they submitted their religious accommodation request to Exxon.    Because Plaintiffs could not receive the COVID-19 vaccine without violating their religious beliefs, they could not comply with the Mandate.    They were thus subject to adverse action through the Company's pretextual and false accommodation of "redesigning" Plaintiffs job duties, including limiting them to domestic flights only, reducing Plaintiffs' "supplemental duties, " and then using this limitation as a pretext for demoting Plaintiffs; reducing their annual performance ratings; and denying them annual performance raises, cost of living adjustments, and annual incentive stock grants.

186.    The Company then explicitly acknowledged Plaintiffs' beliefs as sincere, religious, and in conflict with the Mandate—therefore qualifying them for an accommodation under Title VII.

187.   Exxon then accommodated Plaintiffs for approximately six months (while continually harassing them and threatening their careers if they continued to remain unvaccinated).  During that time, Plaintiffs did not take a COVID-19 vaccine but yet were able to complete their job duties without incident.

188.   When the Company determined that the accommodation of remaining unvaccinated could no longer be tolerated, Exxon ultimately provided no reasonable accommodations options to Plaintiffs.  The Company also refused at that point to engage in the interactive process to attempt to find workable accommodations.  Even if not a standalone claim, the failure to engage in a meaningful interactive process signals an employer's violation of its duty to accommodate because the employer is attempting to remain purposefully ignorant of potential reasonable accommodations.

189.   Exxon acknowledged that its draconian "accommodation" of restricting Plaintiffs to domestic flights did not unduly burden the Company but claimed that the Plaintiffs might not be able to fly to certain other countries (without even identifying the factual scenarios showing that was true).  Exxon failed, however, to considering workarounds such as testing or showing natural immunity before entry to another country, consider that Plaintiffs unvaccinated status did not matter since only 5% of the Houston base's flying was international at all (even less to the supposedly restricted countries), or consider something like voluntary schedule swapping in the unlikely event that one of the Plaintiffs actually received an assignment to a hypothetical country they actually could not enter at all in August or September of 2022.

190.    To establish the defense of "undue hardship," a defendant must demonstrate that any of the aforesaid accommodations would result in a burden that is substantial in the overall context of an employer's business. *Groff*, 600 U.S. at 468. Exxon cannot.

191.    The above stated accommodations required no additional cost or logistical burden to Exxon, much less a substantial one, as was seen when the Company allowed Plaintiffs to continue working for more than six months after the Company-imposed deadline of January 31, 2022, with no change or additional restrictions and before granting them the false accommodation of "redesigned" job duties.

192.    And even before that time it should have been apparent—given the rise of the Omicron variant that caused other companies to suspend their mandated medical treatment programs—that the cost to Exxon in meaningfully accommodating Plaintiffs was zero.

193.    This is underscored by the fact that Exxon rescinded its Mandate in November of 2022.  Everyone had known for months the pandemic had (thankfully) subsided and the CDC had even acknowledged at the beginning of August that vaccinated and unvaccinated individuals should not be treated differently.[87]

194.    The ability to provide reasonable accommodations to employees such as Plaintiffs is also evident by considering other companies such as COVID-19 vaccine

---

[87] Will Stone & Pien Huang, NPR, *With new guidance, CDC ends test-to-stay for schools and relaxes COVID rules* (Aug. 11, 2022).

manufacturers J&J, commercial airlines such as American and Delta, and even the Centers for Disease Control—employers that were able to accommodate individuals with religious-based objections to mandatory COVID-19 vaccination policies.[88]

195.   If the CDC fired *zero* unvaccinated employees—and, indeed, *stopped even asking for employee vaccination status in January of 2022*—Exxon is without excuse as to why it refused to meaningfully accommodate Plaintiffs months later and failed to follow federal employment law in doing so.[89]

196.   Title VII requires an employer to thoroughly consider all possible reasonable accommodations, not unilaterally impose a false and punitive accommodation.  "If the accommodation solution is not immediately apparent, the employer should discuss the request with the employee to determine what accommodations might be effective."[90]

197.   As noted above, it is undisputed that someone cannot catch COVID-19 from someone who does not have COVID-19.  A negative COVID-19 test would have confirmed that Plaintiffs were less of a contagion hazard than untested individuals who were vaccinated at some earlier point in time but who could still contract and transmit COVID-19.

198.   In the face of the reasonable options proposed here—and the fact that Exxon presumably allowed testing/masking for some accommodated employees—the flight department had multiple other reasonable accommodations available.  The

---

[88] *See* Exhibit 3, Declaration of Donn Arizumi.
[89] *See* Exhibit 26, CDC Response to FOIA Request.
[90] EEOC Guidance Section 12: Religious Discrimination; Part IV, A.2.

Company thus cannot demonstrate even a *de minimis*, much less a substantial, burden in providing Plaintiffs with a reasonable accommodation—not the unreasonable option forced on Plaintiffs as a punishment for standing up for their rights.

199.   But in constructively denying Plaintiffs' requests—after apparently reasonably accommodating them for six months (aside from the constant coercion by management)—Exxon provided no justification as to why the punitive "accommodation" it chose was necessary over the clearly available options described above that could be undertaken without undue hardship.  This is especially true where recognition of Plaintiffs' natural immunity (for example) required no cost, effort, or operational change to the status quo (as seen in Exxon's own decision to allow Plaintiffs to continue working with no change to job duties for months after the Company's deadline).

200.   Moreover, Exxon was on notice of the many possible accommodation options for Plaintiffs (not to mention the futility of its Mandate).  Nonetheless, Exxon forged forward with its campaign to pressure and harass its religious employees like Plaintiffs.

201.   Even if the "redesign" of Plaintiffs duties were a reasonable accommodation—and it was not—the reason for which Exxon took the adverse employment action still constitutes a violation of Title VII.  As the Supreme Court has explained, it is unlawful when an employer takes an action against an employee "with the *motive* of avoiding the need for accommodating a religious practice." *EEOC*

*v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015). Here, the best explanation for the wholly unnecessary demotion was that it was merely a pretextual justification for downgrading Plaintiffs' performance assessments (thus allowing Exxon to punish them financially and career-wise).

202.   And to be sure, a dramatic, alternate history version of Plaintiffs' performance for the prior year proves the "accommodation" Exxon gave was unreasonable.

203.   Therefore, Exxon unlawfully discriminated against Plaintiffs based on their sincerely held religious beliefs by failing to reasonably accommodate those beliefs.  Exxon cannot demonstrate that doing so would have imposed *any* hardship, let alone undue hardship, and indeed in word and deed admitted that no such hardship existed, even from its draconian "accommodation" of restricting Plaintiffs to only domestic flights.

204.   Exxon's actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for Plaintiffs' Title VII rights—especially since the Company used the accommodation process itself as a pretext for taking adverse employment actions against Plaintiffs.

205.   As a direct and proximate consequence of Exxon's discriminatory conduct, Plaintiffs have suffered and are suffering economic and pecuniary damages for which they are entitled to judgment.

206.   In addition, as a direct and proximate consequence of Exxon's actions, Plaintiffs have suffered and are suffering non-pecuniary damages in the form of

emotional suffering, humiliation, embarrassment, and mental anguish for which they are entitled to recover compensatory damages in an amount to be determined by the jury.

207.    Accordingly, Plaintiffs requests relief as hereinafter described.

## COUNT TWO:

### TITLE VII – RETALIATION
(42 U.S.C. § 2000e-3(a))

208.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

209.    Title VII also makes it unlawful for "an employer to discriminate against any of [its] employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).

210.    A *prima facie* case for retaliation requires a showing that: (1) the employee engaged in activity protected by Title VII; (2) that an adverse employment action was taken by the employer; and (3) that a causal link existed between the protected activity and the adverse action.  *Ackel v. Nat'l Comms., Inc.*, 339 F.3d 376, 385 (5th Cir. 2003).

211.    Here, Plaintiffs engaged in protected activity under Title VII when they sought a religious accommodation from the Mandate that would otherwise require them to violate their sincere religious beliefs.

212.    Once Plaintiffs had sought (and been granted, even unofficially) their accommodation from the Mandate, Exxon began a campaign of pressure against

them. The Plaintiffs were each repeatedly warned that their careers would suffer if they did not withdraw their objection to the COVID-19 vaccine and take it.

213. Then, after constructively denying Plaintiffs' requests, Exxon continued to pressure them to capitulate and get the COVID-19 vaccine by retaliating against them through the additional coercive techniques of demotion; reductions in their annual performance ratings; verbal pressure; and denials of their annual performance raises, cost of living adjustments, and annual incentive stock grants.

214. Exxon imposed these adverse consequences with the intent to punish and pressure those who sought religious accommodation; Exxon hoped that the constant reminder of termination would result in them abandoning their religious beliefs and surrendering to a coerced injection of a COVID-19 vaccine.

215. But even if the coercion did not make Plaintiffs take a vaccine, Exxon would still be able to punish them for seeking and maintaining an accommodation against he Mandate. The demotions and downgrades in performance rankings were made long after an accommodation would have been necessary and were calculated retaliation against Plaintiffs for exercising their rights.

216. Exxon's treatment of Plaintiffs was also meant to be a warning to others: toe the Company line and do not push back in service of your religious rights or you will be punished.

217. Exxon denied Plaintiffs a reasonable religious accommodation, stealing financial compensation from them and forcing them into a period of extreme

emotional and psychological distress as the Company constantly sought to coerce their compliance.

218.    But for their requests for religious accommodation, Plaintiffs would not have experienced the financial harm from Exxon or the psychological and emotional distress from the period of "accommodation" in which they were constantly pressured to violate their religious beliefs.

219.    Despite significant harassment from Company managers, Plaintiffs maintained their requests for an accommodation from the date the Company began its campaign of retaliation against them through the date the Company rescinded its Mandate and beyond, renewing their requests implicitly each day that passed.

220.    Exxon began retaliating against Plaintiffs in close temporal proximity to their requesting religious accommodations and seeking to enforce their rights through the EEOC.  Moreover, Exxon tied its retaliatory tactics against Plaintiffs directly to their accommodation requests through its pretext of "redesigning" Plaintiffs job duties.  Plaintiffs were demoted and penalized both financially and career-wise for exercising their religious rights.

221.    Further evidence of the retaliation against Plaintiffs was that the Company downgraded their annual performance ratings immediately after granting them an "accommodation" (that was past unnecessary at that point).  Moreover, Exxon even punished Plaintiffs retroactively for the period in which the Company's pretextual "redesign" of their job duties was not in effect.  Said another way, Exxon downgraded Plaintiffs' performance ratings for the period ending March 31, 2022, but

Plaintiffs had not been limited in their flying duties at that time because the Company's pretextual demotion of Plaintiffs to domestic flights only would not start until August or September of 2022. Plaintiffs did, however, file their requests for an accommodation prior to March 31, 2022, revealing the real reason for the Company's actions against Plaintiffs.

222.    Other Exxon employees had gone for stretches without even flying and not had their job rankings plummet at all (some had even gone up). Yet the Company here artificially limited Plaintiffs duties, pretextually stopped them from doing their jobs they had been successfully doing for months unvaccinated, and then used that as the basis for lowering their performance assessments. This is Retaliation 101.

223.    Separately, Exxon continued its retaliatory campaign against Plaintiffs, even after it became apparent that: (1) accommodations were available; (2) the COVID-19 vaccines were not preventing contraction of the virus; (3) individuals with natural immunity possessed superior immunity to those with the vaccine only; and (4) the pandemic had ended (or at least meaningfully receded). Such actions were due to Plaintiffs opposing of Exxon's illegal employment law practice.

224.    Exxon's actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for Plaintiffs' Title VII rights.

225.    As a direct and proximate consequence of Exxon's retaliatory conduct, Plaintiffs have suffered and are suffering economic and pecuniary damages for which they are entitled to judgment.

226.    In addition, as a direct and proximate consequence of Exxon's actions, Plaintiffs have suffered and are suffering non-pecuniary damages in the form of emotional suffering, humiliation, embarrassment, and mental anguish for which they are entitled to recover compensatory damages in an amount to be determined by the jury.

227.    Accordingly, Plaintiffs request relief as hereinafter described.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant, awarding relief as follows:

(i)    Declare Exxon violated Title VII for its failure to provide a reasonable accommodation to Plaintiffs' clearly articulated religious beliefs when numerous no-cost options were available;

(ii)    Declare that Exxon violated Title VII by retaliating against Plaintiffs for engaging in protected activity through seeking religious accommodation;

(iii)    Declare that Exxon violated Texas state law by compelling vaccination despite Plaintiffs' religious beliefs to the contrary, and then by retaliating against Plaintiffs for refusing to comply because of their religious beliefs;

(iv)    Award Plaintiffs damages, including back pay, front pay, pre-judgment and post-judgment interest, punitive damages, and compensatory damages, and other affirmative relief necessary to eradicate the effects

of Exxon's unlawful employment practices (including expungement of artificially downgraded performance reviews based on Exxon's punitive actions);

(v)    Award Plaintiffs damages necessary to make them whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, including but not limited to emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and loss of civil rights, in an amount to be determined at trial;

(vi)   Award reasonable attorneys' fees and costs; and

(vii)  Grant any other relief that the Court deems just and proper;

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all counts so triable.

December 19, 2024                         Respectfully submitted.

                                        /s/ *John C. Sullivan*
                                        John C. Sullivan
                                        Attorney-in-Charge
                                        Texas Bar No. 24083920
                                        Jace R. Yarbrough*
                                        Texas Bar No. 24110560
                                        **S | L LAW PLLC**
                                        610 Uptown Boulevard, Suite 2000
                                        Cedar Hill, TX  75104
                                        Phone: (469) 523-1351
                                        Facsimile: (469) 613-0891
                                        john.sullivan@the-sl-lawfirm.com
                                        jace.yarbrough@the-sl-lawfirm.com

                                        * application for admission
                                           forthcoming

                                        *Attorneys for Plaintiffs*